UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| GABE ELLIS SIMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 3:14-cv-00576 |
| ) | Judge Crenshaw |
| NANCY BERRYHILL, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Pending before the Court is Gabe Ellis Sims' ("Sims") Motion for Judgment on the Administrative Record ("Motion") (Doc. No. 14), filed with a Memorandum in Support (Doc. No. 14-1). The Commissioner of Social Security ("Commissioner") filed a Response in Opposition to Sims' Motion (Doc. No. 15). Upon consideration of the parties' filings and the transcript of the administrative record (Doc. No. 10),[1] and for the reasons given below, the Court will **DENY** Sims' Motion and **DISMISS** the Complaint.

### I.   Introduction

On August 2, 2010, Sims filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, alleging a disability onset date of November 4, 2008 ("alleged onset date"). (A.R. 93.) Sims' claim was denied at the initial and reconsideration stages of state agency review. (Id. at 95, 103.) Sims subsequently requested *de novo* review of his case by an Administrative Law Judge ("ALJ"). (Id. at 97.) The ALJ heard the case on September 18, 2012, when Sims appeared with an attorney and gave testimony. (Id. at 29.) Testimony was also

---

[1] Referenced hereinafter by page number(s) following the abbreviation "A.R."

1

received from an impartial vocational expert. (Id.) At the conclusion of the hearing, the matter was taken under advisement until December 3, 2012, when the ALJ issued a written decision finding Sims not disabled on the alleged onset date. (Id. at 23.) That decision contains the following enumerated findings:

1. Sims meets the insured status requirements of the Social Security Act through December 31, 2011, the alleged onset date.

2. Sims has not engaged in substantial gainful activity since the alleged onset date (20 C.F.R. 404.1571 *et seq*).

3. Sims has the following severe impairments: coronary artery disease status post history of bypass grafting surgery; gout; hypertension; obesity; peripheral artery disease; status post total knee replacement and osteoarthritis; schizophrenia; cognitive disorder; and alcohol abuse (20 C.F.R. 404.1520(c)).

4. Since the alleged onset date, Sims does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526).

5. Sims had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. 404.1567(c) i.e., occasional lifting and carrying up to 50 pounds; frequent lifting and carrying up to 25 pounds; standing or walking for six hours in an eight-hour workday; sitting for six hours in an eight-hour workday, and pushing and pulling with the aforementioned weight limitations. Mentally he can understand, remember, and carry out only simple, unskilled, one-to-three step job instructions and maintain adequate concentration, persistence, and pace on such duties for two hours at a time with customary work breaks. However, he should have no interaction with the general public, cannot work in very tight or enclosed spaces, should not work among crowds of people, and cannot have more than occasional contact with coworkers on a brief and superficial basis.

6. Sims cannot perform past relevant work (20 C.F.R. 404.1565).

7. Sims was born on February 6, 1953 and was 58 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 C.F.R. 404.1563).

8. Sims has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9. Transferability of job skills is not material to the determination because using the Medical Vocational Rules as a framework supports a finding that Sims is "not disabled," whether or not he has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering Sims' age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Sims could perform (20 C.F.R. 404.1569 and 404.1569(a)).

(Id. at 12–23.)

On January 7, 2014, the Appeals Council denied Sims' request for review of the ALJ's decision, thereby rendering that decision the final decision of the SSA. (Id. at 1.) This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g).

## II.     Review of Record

The Court adopts the summary of Sims' records from the ALJ's decision. (A.R. 15–21.)

## III.     Conclusions of Law

### A. Standard of Review

This Court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. See Hernandez v. Comm'r of Soc. Sec., 644 F. App'x 468, 473 (6th Cir. 2016 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012)

3

(quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." Miller, 811 F.3d at 833 (quoting Gentry v. Comm'r of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014)).

### B. Five-Step Inquiry

The claimant bears the ultimate burden of establishing entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart B of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Parks v. Soc. Sec. Admin., 413 F. App'x 856, 862 (6th Cir. 2011) (citing Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functioning capacity[.]" Kepke v. Comm'r of Soc. Sec., 636 F. App'x 625, 628 (6th Cir. 2016) (quoting Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. See Anderson v. Comm'r of Soc. Sec., 406 F. App'x 32, 35 (6th Cir. 2010); Wright v. Massanari, 321 F.3d 611, 615–616 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. Wright, 321 F.3d at 615–616; see Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's prima facie case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. Anderson, 406 F. App'x at 35; see Wright, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical,

5

exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Glenn v. Comm'r of Soc. Sec., 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. Weighing Medical Source Evidence

The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. Cole v. Astrue, 661 F.3d 931, 937 (6th Cir. 2011). The significant deference accorded to the Commissioner's decision is conditioned on the ALJ's adherence to these governing standards. In Gentry v. Commissioner of Social Security, the Sixth Circuit re-stated the responsibilities of the ALJ in assessing medical evidence in the record in light of the treating source rule:

> Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings. 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513. The second is known as the "treating physician rule," see Rogers, 486 F.3d at 242, requiring the ALJ to give controlling weight to a treating physician's opinion as to the nature and severity of the claimant's condition as long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2) (language moved to 20 C.F.R. § 404.1527(c)(2) on March 26, 2012). The premise of the rule is that treating physicians have the best detailed and longitudinal perspective on a claimant's condition and impairments and this perspective "cannot be obtained from objective medical findings alone." 20 C.F.R. § 416.927(d)(2) (language moved to 20 C.F.R. § 416.927(c)(2) on March 26, 2012). Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors. Rogers, 486 F.3d at 242. In all cases, the treating physician's opinion is entitled to great deference even if not controlling. Id. The failure to comply with the agency's rules warrants a remand unless it is harmless error. See Wilson, 378 F.3d at 545–546.

6

741 F.3d 708, 723 (6th Cir. 2014).

The Sixth Circuit has also made clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—*i.e.*, "cherry-picking" it—to avoid analyzing all the relevant evidence. Id. at 724 (citing Minor v. Comm'r of Soc. Sec., 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); Germany-Johnson v. Comm'r of Soc. Sec., 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports.")). This is particularly so when the evidence ignored is from a treating physician. Ignoring medical evidence from a treating source in fashioning the RFC, without a proper analysis of why such action is taken, cannot be harmless error because it "undermines [the ALJ's] decision" to overlook evidence that could have potentially supported a more restrictive RFC or even a finding of disability. Gentry, 741 F.3d at 729 (citations omitted); Grubbs v. Comm'r of Soc. Sec., No. 12–14621, 2014 WL 1304716, at *2 (E.D. Mich. Mar. 31, 2014) ("The absence of a review of treatment records from a treating source and the lack of analysis of such made it impossible for the ALJ to properly assess whether the Plaintiff was disabled and/or whether Plaintiff had the residual functional capacity to do any work.").

### D. Sims' Statement of Errors

#### 1. The ALJ Failed to Include a Function-by-Function Assessment in the RFC as Required by SSR 96-8p and the RFC Finding Lacks Substantial Evidence.

Sims claims that the ALJ failed to include a function-by-function assessment, as required by SSR 96-8p, because he failed to address Sims' ability to interact appropriately with supervisors, bend, stoop, kneel, crouch, crawl, climb, and be exposed to hazards such as unprotected heights, moving machinery, and temperature extremes. (Doc. No. 14-1, at 13–15.) However, the ALJ is

only required to make a function-by-function assessment for those capacities for which a claimant alleges limitations. Delgado v. Comm'r Soc. Sec., 30 F. App'x 542, 547–548 (6th Cir. 2002). Sims cites no evidence to support his claims regarding environmental limitations. Therefore, the ALJ's failure to include a function-by-function assessment addressing Sims' exposure to temperature extremes is not reversible error.

To support his claims regarding physical limitations, Sims asserts that "records show severe arthritis . . . due to his advanced osteoarthritis of all compartments of the left knee." (Doc. No. 14-1, at 14.) However, the December 9, 2011 treatment records of Thomas E. Tompkins, M.D., that Sims cites merely state that his "left knee has an effusion. There is some atrophy in his quadriceps . . . 5 degree flexion contracture . . . flexes to 110. His knee is stable. There is mild varus deformity. . . has end-stage arthritis." (Doc. No. 14-1, at 14 (citing A.R. 395.)) This is a far cry from Sims' assertion that he has "severe arthiritis." (Doc. No. 14-1, at 14.) Moreover, the records also show that Dr. Tompkins subsequently performed a left knee total replacement that was intended to improve Sims' condition. (A.R. 270, 395.) In post-operative medical records, Dr. Tompkins noted that "approximately 3 weeks post left total knee" imaging studies of "[t]hree views of his knee, standing, show well-fixed, well-placed total knee" but that Sims "has not been very compliant with going to therapy, often leaving early because of pain" and "impressed upon him the need to exercise his knee and go to therapy regularly." (A.R. 394.)

Given Sims' relatively positive post-operative assessment and reliance on merely two, pre-operative medical records that do not address his ability to bend, stoop, kneel, crouch, crawl, climb, or be exposed to hazards such as unprotected heights and moving machinery, the Court finds that Sims has not alleged any limitations related to these functions. It is not the task of the Court to raise limitations when the claimant himself fails to do so. Delgado, 30 F. App'x at 547–548.

Consequently, there is no reversible error in the ALJ's omission of these capacities in Sims' functional assessment.

To support his claims regarding his ability to interact appropriately with supervisors, Sims points to his own accounts—at the hearing (A.R. 47–48, 52), in the function report (id. at 185–186), to consultative examiner Dr. Pettigrew (id. at 277, 279), and to mental health providers at Centerstone (id. at 447)—that he has difficulty getting along with people and had problems with his supervisor on his last job when he was fired. (Doc. No. 14-1, at 13–14.) The ALJ noted Sims' Centerstone records (A.R. 19), concluded that Sims' "main problem has been getting along with others" and assessed him with "moderate limitations in social functioning." (Id. at 14.) The RFC reflects that Sims should have "no interaction with the general public, cannot work in very tight or enclosed spaces, should not work among crowds of people, and cannot have more than occasional contact with coworkers on a brief and superficial basis." (Id. at 15.)

The portions of the record cited by Sims for the proposition that he has problems interacting appropriately with supervisors are reports of what Sims himself conveyed to medical professionals or the Commissioner. (Id. at 47–48, 52, 185–186, 277, 279, 447.) Subjective complaints by a claimant regarding his own symptoms do not, on their own, provide conclusive evidence of disability. 42 U.S.C. §423(d)(5)(A); 20 C.F.R. § 416.929. There "must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the . . . symptoms alleged . . ." 42 U.S.C. §423(d)(5)(A). Sims cites to no such records, so the ALJ's failure to fully credit Sims' statements regarding his problems interacting appropriately with supervisors and include them in a function-by-function symptoms assessment is not reversible error.

**2. The ALJ Failed to Properly Evaluate the Opinion of Sims' Treating Mental Health Provider.**

Sims claims that the ALJ erred by giving little weight to the opinion of Brenda Keith, a licensed clinical social worker who treated him at Centerstone and completed a May 21, 2012 medical source statement assessing him with marked limitations in the basic demands of competitive, remunerative, unskilled work. (Doc. No. 14-1, at 16.) While Sims acknowledges that Keith is not an acceptable medical source within the meaning of SSR 06-3p, he claims that Keith's opinion was, nevertheless, "important, and should be evaluated on key issues such as impairment severity and functional effects, along with other evidence in the file." (Id. at 18.) Sims asserts that the ALJ erred by not evaluating Keith's opinions, or providing "sufficient explanation whatsoever regarding the weight given to these opinions or how they were accounted for in his decision." (Id.) Sims also asserts that the ALJ "failed to mention or apply SSR 06-3p and offered a completely erroneous basis for rejecting Ms. Keith's opinion." (Id.)

The ALJ need neither mention nor apply SSR 06-3p to Keith's opinion. Pursuant to SSR 06-3p, the ALJ may use evidence from licensed clinical social workers to show the severity of a claimant's impairment and how it affects his ability to function. However, unlike acceptable medical sources, information from licensed clinical social workers cannot establish the existence of a medically determinable impairment, give medical opinions, or be considered treating sources whose medical opinions may be entitled to controlling weight. SSR 06-3p. The factors outlined by SSR 06-3p "can be applied" to licensed social workers and include the duration and frequency of the treating relationship with the claimant, the consistency of the opinion with other evidence, the degree to which the social worker presents relevant evidence to support her opinion, how well the social worker explains her opinion, whether she has a specialty or area of expertise related to

the claimant's impairment, and any other factors that refute or support the opinion." Id. However, "not every factor for weighing opinion evidence will apply in every case," and "[t]he fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight[.]" Id.

Consequently, there is no requirement that an ALJ apply the factors outlined in SSR 06-3p to Keith, who is not an acceptable medical source, and should he apply them at all, there is no requirement that he apply each factor. Indeed, SSR 06-3p expressly permits an ALJ to afford greater weigh to an acceptable medical source. Here, that is precisely what the ALJ did. He gave Keith's opinion "very little weight" due to Sims' "minimal mental health treatment, his reported activities, and Dr. Pettigrew's evaluation finding[.]" (A.R. 21.) Although the permissive language of SSR 06-3p does not require the ALJ to apply any particular factors to evaluate a social worker's opinion, it appears that the ALJ implicitly applied SSR 06-3p by considering the duration and frequency of Sims' relationship with Keith and the consistency of Keith's opinions with other evidence and giving greater weight to Dr. Pettigrew, who is an acceptable medical source. (Id.)

Sims claims this insufficient and erroneous because both Dr. Pettigrew's assessment and "the evidence does support marked limitations." (Doc. No. 14-1, at 19 (citing to A.R. 277, 279.)) However, the portions of the record cited by Sims do not describe him as having marked limitations; they describe him as having "impairment in his ability to establish and maintain reciprocal and cooperative relationships" but say nothing about the severity of that impairment. (Id.) In revisiting portions of the record that the ALJ already evaluated, Sims is effectively "marshalling evidence to suggest" that the record supports an alternative finding. Peterson v. Comm'r Soc. Sec., 552 F. App'x 533, 540 (6th Cir. 2012). However, upon district court review, the question is not whether the ALJ could have reached a different determination based on the

11

evidence in the record, but whether the ALJ's finding "is not supported by substantial evidence." Id.; see also Ulman v. Comm'r Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (holding that, while the ALJ erred in making an observation that error was harmless, as "substantial evidence is the applicable standard of review not perfection.") Given that Keith is not an acceptable medical source and the totality of the record, including the assessment by Dr. Pettigrew, the Court cannot conclude that the ALJ's conclusion is "not supported by substantial evidence." Peterson, 552 F. App'x at 540.

### 3. The ALJ's Failed to Find Sims Limited to a Maximum of Light Work and, Therefore, Disabled Under the Medical-Vocational Guidelines.

Sims claims that his physical "impairments and related limitations are highly inconsistent with the ability to perform medium work on a regular or continuing basis." (Doc. No. 14-1, at 20.) Specifically, Sims claims that his impairments and limitations include "severe knee impairments with severe end stage osteoarthritis in all compartments of his left knew . . . long-standing pain in his left knee which was fairly constant, and aggravated by walking and standing . . . coronary artery disease post bypass grafting, as well as hypertension and obesity." (Id. (citing A.R. 370, 395, 13.)) The ALJ found that Sims' medical treatment did not support his allegations concerning the severity of his impairments. (A.R. 16–17.)

As discussed supra 9, there "must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities" for the ALJ to hold that Sims has physical limitations. 42 U.S.C. §423(d)(5)(A). The ALJ specifically cited to medical tests that confirmed the normalcy of Sims' conditions. (A.R. 16–17.) With regards to Sims' cardiovascular impairments, the ALJ noted a history of coronary artery disease post bypass grafting, hypertension, and obesity, but cited multiple instances where medical testing

revealed that Sims' cardiovascular conditions were within normal limits. (Id.) The ALJ also addressed Sims' musculoskeletal impairments, such as gout and left knee pain. In doing so, the ALJ noted the absence of exacerbated gout symptoms prior to the date last insured (id.) and his post knee-replacement treatment records were generally positive, prescribed no limitations, and noted his non-compliance with prescribed therapies. See supra 8. While it is true that Sims had some test results that showed abnormal blood pressure or decreased range of motion in his left knee, those records noted his non-compliance with prescribed medication and therapies. See id. This Court has previously considered a claimant's inconsistency in taking prescribed medications and gaps in treatment in determining that he or she is not credible. Ranellucci v. Astrue, No. 3:11-cv-00640, 2012 WL 4484922, *10 (M.D. Tenn. Sept. 27, 2012). Consequently the ALJ's reliance on Sims' non-compliance to support his finding that Sims' impairments were not as disabling as Sims' asserts was proper. Once again, Sims' argument amounts to a rehashing of the record in an effort to assert that his impairments preclude medium work. Supra 11–12. Given that the ALJ cited numerous objective medical records in his finding, the Court does not find that Sims' reinterpretation establishes that the ALJ's decision is "not supported by substantial evidence." Id.

4. **The ALJ Significantly Misrepresented and/or Mischaracterized Critical Evidence Regarding the Severity of Sims' Impairments and the Credibility of His Allegations.**

Sims claims that the ALJ's statements concerning his work history and alcoholism misrepresented and mischaracterized substantial evidence of record. (Doc. No. 14-1, at 22.) Specifically, Sims points to the ALJ's statement that Sims does not have much of a work history during his adult life, noting that Sims was incarcerated for most of his adult life and asserting that the ALJ used Sims' inability to enter the work force to "discredit his allegations." (Id.) Sims also points to the ALJ's conclusion that Sims "tried to downplay his alcoholism" and "his alcohol abuse

appears to be his biggest problem causing him the most difficulty in getting along with people and focusing on work." (Id. (citing A.R. 20.))

The ALJ reached these conclusions without any citation to the record and that, in doing so, failed to adhere to the steps outlined by 20 C.F.R. 404.1535. (Doc. No 14-1, at 22.) However, "even if an ALJ's adverse credibility determination is based partially on invalid reasons, harmless error analysis applies to the determination, and the ALJ's decision will be upheld as long as substantial evidence remains to support it." Johnson v. Comm'r of Soc. Sec., 535 F. App'x 498, 507 (6th Cir. 2013). Here, this error constituted merely two sentences in a six-page RFC determination analysis; it did not detract from the substantial evidence the ALJ mustered and cited—from multiple, normal medical test results, repeated medical provider notes regarding Sims's failure to comply with prescribed medication and treatment, and assessments of acceptable medical sources—to support Sims' RFC assessment. Accordingly, the error was harmless and not reversible.

## IV. Conclusion

For the foregoing reasons, Sims' Motion for Judgment on the Administrative Record (Docket No. 14) will be **DENIED** and Plaintiff's Complaint will be **DISMISSED.**

An appropriate order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE